**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

DAVID R. ROGERS,             )
                                    )
       Plaintiff,          )
                                    )
vs.                           )     CIV. A. NO. 23-164-MU
                                    )
TIFFIN MOTOR HOMES, INC., *et al*.,  )
                                    )
       Defendants.    )

## MEMORANDUM OPINION AND ORDER

This case came on for a bench trial before the Court on November 12-13, 2024. Upon consideration of the statement of the case and agreed facts set out by the parties in their final pretrial document (Doc. 86), the testimony offered by the witnesses during the bench trial, and the exhibits admitted without objection (Doc. 99, PageID.3068-69; Doc. 100, PageID.3284), and all other relevant pleadings, the Court enters this final memorandum opinion and order pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and S.D. Ala. GenLR 73(c) & (d).[1]

## I.    FINDINGS OF FACT

Plaintiff Randy Rogers ("Rogers") purchased a new 2021 Phaeton 40 IH Class A Diesel motorhome (the "Motorhome") manufactured by Defendant Tiffin Motor Homes, Inc. and sold by Defendant Dixie RV Superstores of Grand Bay, LLC, d/b/a Great American RV Superstores ("Great American") on June 11, 2021. (Plaintiff's Exhibit 1). The total purchase price of the Motorhome was $393,447.47. (*Id*.).  The total price

---

[1] Any appeal taken from this memorandum opinion and order and judgment shall be made to the Eleventh Circuit Court of Appeals. (*See* Doc. 13 ("An appeal from a judgment entered by a magistrate judge shall be taken directly to the United States court of appeals for this judicial circuit in the same manner as an appeal from any other judgment of this district court.")).

includes the vehicle sales price of $362,500, $10,889.97 in sales tax, $515.50 in title and document fees, and $19,542 in additional warranties and protections through National Auto Care. (*Id*.). Rogers made a down payment of $60,000 and financed the remaining $333,447.47 of the purchase price through an installment sales contract requiring monthly payments of $2,198.76 over 240 months. (*Id*., p. 5).

The Buyer's Order form from Great American states that Great American makes "no express or implied warranties" and sells the Motorhome "AS IS – NOT EXPRESSLY WARRANTED OR GUARANTEED, WITH ALL FAULTS." (*Id*., p. 4). The form then notes that new vehicles are "subject to a standard written manufacturer's warranty," which "is made by the manufacturer and not by us." (*Id*.). Tiffin provided a one-year/12,000 mile Limited Warranty (the "Warranty") with the purchase of the Motorhome. (Defendants' Exhibit 2). In its introductory paragraph, the Warranty states:

> Your new motorhome is a complex and sophisticated machine, literally a house on wheels.
> ***
> Given the complexity of motorhomes, it should be expected that some systems or components may not operate correctly from time to time. It may take time to diagnose and repair such problems. When this happens, we thank you in advance for your patience and understanding.

(*Id*., p. 1). In the section titled "Warranty Period and Remedies," the document states that Tiffin:

> promises to repair or replace, as necessary, at its option, any defects in materials or workmanship, to the covered portion of the motorhome which are defective at the time of purchase or become defective during normal use during the Warranty Period, at no charge to purchaser…These are purchaser's sole and exclusive remedies.

(*Id*.).

After closing on June 11, 2021, Rogers took delivery of the Motorhome and drove it off Great American's lot on June 29, 2021. (Doc. 99, PageID.2830, 2844). Delivery was delayed because Rogers had to get a new vehicle that he could tow behind the Motorhome, and Great American then had to install a tow system. (Doc. 99, PageID.2845; Plaintiff's Exhibit 14). Rogers paid $4,825.27 for the necessary towing equipment and its installation by Great American. (Plaintiff's Exhibit 14, p. 20). There were also several items Rogers referred to as "we owe" items that were identified during the initial walk-through of the Motorhome that Great American needed to address. (Doc.99, PageID.2845-47).

The tow vehicle was not ready before Rogers and his wife took their first planned trip on July 1, 2021, so Rogers picked up the Motorhome on June 29, 2021, and took the first trip without the tow vehicle. (Doc. 99, PageID.2847). Before Rogers left on this trip, the large kitchen wall slide, located behind the driver's seat, would not retract or extend properly and functioned only intermittently. (Doc. 99, PageID.2849-50). The Motorhome cannot be driven with the slide extended. (Doc. 99, PageID.2851). After speaking to Great American on the phone, Rogers was able to perform a "bypass" to get the slide to function properly and then was able to leave on the trip. (Doc. 99, PageID.2850). Once Rogers arrived at the destination and began to set up, the rear awning on the passenger side of the Motorhome would not stay deployed, so he ultimately left it retracted. (Doc. 99, PageID.2851-52). Rogers' wife could not get the dishwasher to work. (Doc. 99, PageID.2852). After this initial trip, Rogers returned the Motorhome to Great American to address these issues and to pick up his tow vehicle that was now ready. (Doc. 99, PageID.2852).

Problems with the slide out continued intermittently for approximately the next eight months until the motor was replaced. (Doc. 99, PageID.2855; Plaintiff's Exhibit 10, p. 32). During this time, whenever the slide would fail to retract, Rogers had to go outside the Motorhome and perform a manual bypass by pushing on the circuit board so that the slide would retract and the Motorhome could be driven. (Doc. 99, PageID.2856-57). Every time Rogers had to perform the bypass process to reset the circuit board, he was worried that the slide would not retract and he would be stuck, unable to drive the Motorhome. (Doc. 99, PageID.2857-58). Rogers later found out in the course of litigation that this slide was malfunctioning and had to be repaired in March 2021, before he purchased the Motorhome. (Doc. 99, PageID.2859; *see* Plaintiff's Exhibit 8).

Rogers experienced problems with the leveling systems, which caused the Motorhome to tilt to one side and ride rough. (Doc. 99, PageID.2860-62). The level indicators were eventually reset after approximately six months, alleviating the rough ride, but the Motorhome continued to tilt at rest. (*Id*.). The rear awning would extend and then retract immediately, which was corrected approximately six months later when the wind sensor motor was replaced. (Doc. 99, PageID.2867). There was also an issue with a different awning over the Motorhome's door that began to work only intermittently. (Doc. 99, PageID.76-77).  The sensors that monitor the levels of the Motorhome's water tanks failed within the first few months, and it took several months for new parts to arrive and be installed. (Doc. 99, PageID.2869-70). Without being able to monitor the tank levels, Rogers was worried the wastewater tank would overflow and cause sewage to backup into the Motorhome. (Doc. 99, PageID.2869-71). The Motorhome's interior LED control

panel that is used to operate lights and awnings, among other things, failed in April 2022 and took several months to be fixed. (Doc. 99, PageID.2875-76).

A number of safety recalls were also issued for the Motorhome during Rogers' first year of ownership. (Doc. 99, PageID.2867).  A safety recall notified Rogers of potential leaks in the fuel line assembly, which could cause a fire and needed to be checked immediately. (Doc. 99, PageID.2866). Another recall identified a faulty valve stem that could cause a blowout on the inner tandem tire. (Doc. 99, PageID.2866). There was a recall involving wiring in the dinette wall to address a potential fire or electrical shock hazard. (Doc. 99, PageID.2866). A recall was issued for a seat belt that was not installed properly. (Doc. 99, PageID.2866). Each recall required Rogers to bring the Motorhome back to Great American to address these safety hazards. (Doc. 99, PageID.2866).

In late June 2022, approximately one year into his ownership of the Motorhome, Rogers and his wife took a trip to an RV resort with their two grandsons. (Doc. 99, PageID.2883-84). Rogers described sitting on the couch watching TV while it was raining outside when water began dripping down across the fascia just above the wall slide on the passenger side of the Motorhome. (Doc. 99, PageID.2883-84). Rogers and his wife used beach towels and a kitchen pot to collect the water. (Doc. 99, PageID.2884). Rogers took videos of the water leaking into the Motorhome, which the Court has reviewed, and they show a significant amount of water intrusion into the Motorhome. (Doc. 99, PageID.2884, 2886-888; Plaintiff's Exhibits 19, 20[2]). Rogers stated that the ceiling was

---

[2] Rogers states that the video submitted as Plaintiff's Exhibit 20, which is titled as being from the "second leak" in August 2022, is in fact from the "first leak" in June 2022. (Doc. 99, PageID.2887, 2891).

discolored where the water had absorbed and when he touched that area, "it felt soft and cushiony". (Doc. 99, PageID.2887).

Rogers contacted Great American and arranged to drop the Motorhome off for repairs as soon possible when they returned from their trip. (Doc. 99, PageID.2888). Rogers returned the Motorhome to Great American on approximately July 5, 2022. (Doc. 99, PageID.2961). Approximately 24 days later, on July 29, 2022, Aaron Rose, a sales representative at Great American, texted Rogers to let him know the "leak is good to go" and they "got 2-3 other things fixed" as well. (Plaintiff's Exhibit 10, p. 1; Doc. 99, PageID.3023-24). Great American told Rogers that the leak was caused by a rubber seal that comes down over the slide, which may have been inverted. (Doc. 99, PageID.2889). Josh Barnhill, the service manager at Great American, testified that they "re-adhered" the wiper seals and water-tested the Motorhome by spraying it with water in the area where the leak was reported. (Doc. 100, PageID.3150, 3192). No material was removed or replaced from the Motorhome, and he did not inspect the rear of the Motorhome at that time. (Doc. 100, PageID.3193-94).

The next trip Rogers took began on August 11, 2022, when he took off with his wife and his two grandsons to another RV resort. (Doc. 99, PageID.2893). Rain fell off and on as they traveled to the resort and at the time they arrived at the resort. (Doc. 99, PageID.2893). Rogers stated that they got set up and that night "all this water is pouring back through the same area once again." (Doc. 99, PageID.2893). Rogers' wife was laying down with their youngest grandson to sleep and woke up to water "coming in" on her. (Doc. 99, PageID.2893; Doc. 100, PageID.3129). She then woke up Rogers, and they began trying to clean up the water with towels and containers, with a "curtain of

water" coming into the Motorhome in the same area as the first leak that occurred in June 2022, only more water was now coming in. (Doc. 99, PageID.2893-94). Rogers did not see water coming from any other areas that evening. (Doc. 99, PageID.2894).

Later that night, Mrs. Rogers was in the rear bathroom and noticed a "little muddy black puddle" on the floor and then saw "black going up the wall" and a crack on the cabinet. (Doc. 100, PageID.3130). Mrs. Rogers also noticed water residue in the master closet in the rear of the Motorhome. (Doc. 99, PageID.2894). She felt the wall inside the closet, and it was wet where her clothes were. (Doc. 100, PageID.3130). There was water sitting in the light fixture in the master closet. (Doc. 99, PageID.2897; Plaintiff's Exhibit 11, p. 22). The bottom of the electrical cabinet with a fuse panel had what appeared to be mold on it, and there were additional water issues such as wood cracking and swelling in that area. Rogers opined these problems were the result of months of leaking into that area that they could not see. (Doc. 99, PageID.2894, 2898; Plaintiff's Exhibit 11, p. 20-21). Mrs. Rogers stated that when her husband opened the cabinet "it was just full. It was black." (Doc. 100, PageID.3130.). A large amount of water was also noticed under the Motorhome on the cement pad where it was parked. (Doc. 99, PageID.2895; Plaintiff's Exhibit 21). At this point, Rogers was concerned with the water near the electrical panel, the presence of mold, the damage to the cabinetry that would need to be replaced, and the amount of time the Motorhome was going to be out of service for needed repairs. (Doc. 99, PageID.2900-01). Mrs. Rogers told her husband that she did not ever want to get back in the Motorhome and was not comfortable being in it after seeing what she thought was mold inside. (Doc. 100, PageID.3131-32).

Rogers then cut this trip short and left the next day to get the Motorhome out of the weather and get the leak fixed. (Doc. 99, PageID.2895). Rogers messaged Rose again to let him know he was still having leak issues. (Doc. 100, PageID.3024). Rogers brought the Motorhome back to Great American around August 28, 2022. (Doc. 103, PageID.3335). Rose noted mold in the rear bathroom of the Motorhome around the cabinet. (Doc. 100, PageID.3024). In early September 2022, a Tiffin technician came to Great American to look at the Motorhome. The determination from that review was that the Motorhome needed to be sent to Tiffin's factory service center in Red Bay, Alabama for repairs. (Doc. 99, PageID.2919, 2960, 3026). Rogers communicated with Greg Dees, Warranty Field Operations Director at Tiffin, once the Motorhome was in Red Bay. (Doc. 99, PageID.2919-20, 2994; Defendants' Exhibit 15, p.1). On September 7, 2022, Dees requested a list of issues that needed to be addressed. Rogers provided the list the same day. (Doc. 99, PageID.2920; Doc. 100, PageID.3200-01; Defendants' Exhibit 15). Rogers' list requested repairs under the warranty for the water leak in front passenger side over the couch and dinette area, the water leak in the rear master bath and closet, and also that all visible "black mold" is located, tested, and treated. (Defendants' Exhibit 15, p. 4). The list also included a request that the carpet cover panels for the water tanks are replaced along with several other miscellaneous repair or replacement requests. (Defendants' Exhibit 15, p. 4). Dees stated that, to his knowledge, Tiffin repaired everything on Rogers' list. (Doc. 100, PageID.3205).

Rogers received a call with an update from the technician in Red Bay who was working on his Motorhome. (Doc. 99, PageID.2920). Rogers documented this call with handwritten notes that list the date of the call as September 22, 2022. (Plaintiff's Exhibit

32; Doc. 99, PageID.2923-24, 2992). The technician, Tiffin employee Bryon Stidham,[3] told Rogers that he had identified four different areas that he believed were causes of the leaks, which included a misplaced anchor bolt in the subceiling and screws in the air conditioning drain lines. (Doc. 99, PageID.2920-21; Plaintiff's Exhibit 32, p.1). Stidham also told him that most of the ceiling and all of the electrical panel cabinet had been removed from the Motorhome, and a large amount of water was removed from the ceiling. (Doc. 99, PageID.2921-22; Plaintiff's Exhibit 32). Rogers asked for pictures so he could see the "coach ceiling and interior mold/water damages" including a picture from the driver's seat to the back of the Motorhome. (Doc. 99, PageID.2922; Plaintiff's Exhibit 32, p. 2). In response, he received one photograph from Dees on October 4, 2022, showing only a small portion of the ceiling in the back of the Motorhome with the subceiling still exposed.[4] (Doc. 99, PageID.2922; Plaintiff's Exhibit 31, p. 39). Rogers described the photograph as showing "not new materials. That is some of the original materials that was pulled out and like a checkerboard or puzzle put back in there." (Doc. 99, PageID.2925).

At trial, Stidham explained that the electrical cabinet was removed in order to get the ceiling panels down, and the cabinet was later "rebuilt" and placed back into the Motorhome. (Doc. 100, PageID.3078-80). Stidham also stated that the back closet wall had to be removed, and he thinks they replaced the wood that had been wet. (Doc. 100, PageID.3080). He said only the ceiling panels in the rear bathroom and closet were

---

[3] Rogers' notes refer to the technician as "Brian". (Plaintiff's Exhibit 32). Tiffin's documents regarding the repairs to the Motorhome include a call log with handwritten notes listing that "Bryon S" spoke with Rogers on September 19, 2022, September 21, 2022, and October 4, 2022. (Plaintiff's Exhibit 34, p. 8). Testimony at trial confirmed that the technician who spoke with Rogers was Tiffin employee Bryon Stidham. (Doc. 100, PageID.3085-86, 3108).

[4] Dees testified that the picture was taken for him by someone in the Red Bay service department and that he had never been inside Rogers' Motorhome. (Doc. 100, PageID.3209).

removed, and the panels above the slideout behind the passenger seat were not removed. (Doc. 100, PageID.3081). Stidham removed the trim and resealed the top of the slide. (Doc. 100, PageID.3082; Plaintiff's Exhibit 34, p. 1). Stidham also removed a panel and discovered that four screws that mount the ladder onto the rear of the Motorhome were screwed into the air conditioning drain line. (Doc. 100, PageID.3082-84; Plaintiff's Exhibit 34, p. 1). The technicians patched the drain lines and "put new lines in, about 6 inches up". (Doc. 100, PageID.3084). Tiffin completed its repairs on the Motorhome at its Red Bay facility on October 11, 2022. (Defendants' Exhibit 23, p.1; Doc. 100, PageID.3116). On November 2 and November 22, 2022, Josh Barnhill, the service manager at Great American, sent text messages to Rogers to follow-up on a voicemail he had left letting Rogers know his Motorhome was back from Tiffin and ready to be picked up. (Doc. 100, PageID.3150, 3168; Defendants' Exhibit 12, p. 31). Rogers never picked up his Motorhome from Great American. (Doc. 100, PageID.3169).

The information Rogers received from Tiffin regarding the damage and repairs to his Motorhome was "the tipping point" for him. (Doc. 99, PageID.2925). In light of the numerous problems already experienced with his Motorhome, his confidence was lost that it could ever be adequately repaired after finding out that the ceiling had been ripped out. (Doc. 99, PageID.2925). Further, he felt deceived by the lack of information provided in response to his request for photographs of the damage. (Doc. 99, PageID.2926). At this point, Rogers did not believe that the Motorhome could have substantially the same value as what he had purchased. (Doc. 99, PageID.2926-27). On November 1, 2022, Rogers, through his lawyer, sent a letter to Tiffin and Great American notifying them that he was revoked his acceptance of the Motorhome, which remained in Great American's

possession, and requested a full refund of the purchase price along with incidental and collateral expenses. (Doc. 99, PageID.2933; Plaintiff's Exhibit 36). On April 30, 2024, Rogers went into the Motorhome a final time so that his retained expert, Patrick Meyer, could perform an inspection. (Doc. 99, PageID.2933-34). Rogers believed there was still evidence of water damage in the Motorhome at that time, including stains on the walls. (Doc. 99, PageID.2935-36).

After years of saving and planning for the purchase of a motorhome, Rogers ultimately decided on the Tiffin Phaeton model, which he intended to use with his family to travel together during his retirement. (Doc. 99, PageID.2827-29, 3018; Doc. 100, PageID.3123). In fact, Rogers had a vanity plate made for the Motorhome that said "OURTYM3," reflecting that Rogers intended to use the Motorhome during his and his wife's retirement – "our time" – to vacation as a family and with their grandchildren. (Doc. 100, PageID.3123). Rogers purchased the extended warranty, with the understanding that it could be transferred to a later owner, because he planned to "move up to another unit" at a later time, and he understood the extended warranty would increase the value of the Motorhome. (Doc. 99, PageID.2831-32). He also said the Phaeton was Tiffin's top selling unit, which was another reason they chose this model. (Doc. 99, PageID.2940).

When the Motorhome was not in use, Rogers kept it in storage. (Doc. 99, PageID.2848). He initially kept the Motorhome in a covered but unenclosed storage unit for several weeks until he could secure a space in an enclosed and climate-controlled facility. (Doc. 99, PageID.2847-49). Rogers used the permanent storage facility solely for the Motorhome, and the monthly rental fee was $450. (Doc. 99, PageID.2849). In 2021 and 2022, Rogers paid for a reserved RV spot to attend football games at his alma mater,

and, in 2022, he incurred hotel expenses to attend games when the Motorhome was out of use. (Doc. 99, PageID.2947-48; Plaintiff's Exhibit 38).

Rogers described his experience with the Motorhome as "a nightmare" that has prevented him from being able to enjoy his retirement and has taken a toll on him and his immediate family. (Doc. 99, PageID.2944). The ordeal, Rogers states, has affected his sleep and is constantly on his mind. (Doc. 99, PageID.2944). Despite not having the Motorhome in his possession, Rogers continues to make the monthly payments of $2,198.76 on the Motorhome. (Doc. 99, PageID.2840). Rogers continues to insure the Motorhome. (Doc. 99, PageID.2946-47; Plaintiff's Exhibit 38). Rogers stated that if he were to sell the Motorhome now, he would feel compelled to disclose his experiences with it, and, in his opinion, he would only receive around $100,000 for it. (Doc. 99, PageID.2938-39). If the Motorhome had not been defective, Rogers believed the Motorhome would have depreciated about fifteen percent from the price he paid. (Doc. 99, PageID.2940).

Defense counsel prepared a demonstrative calendar based on admitted evidence to illustrate the days the Motorhome was in use and days it was brought in for repair, which it reviewed with Rogers at trial and submitted with its post-trial briefing. (Doc. 103, PageID.3321-38; Doc. 99, PageID.2997-3007). Despite the issues with the Motorhome, Rogers did take at least twelve trips to various RV resorts and six trips to college football games in his Motorhome between July 1, 2021, and August 13, 2022. (Doc. 99, PageID.2982-85; Defendants' Exhibit 10). However, in the 488 days between the date Rogers took possession of the Motorhome on June 29, 2021, and November 1, 2022, when he sent the letter to revoke his acceptance, neither party appears to dispute that

the Motorhome was in for repairs for at least 137 days of those 488 days. Further, the 137 days is a conservative estimate of days the Motorhome was out of use, because the service tickets or work orders used to prepare the calendar only indicate the dates work was actually underway and the dates work was completed, and they do not necessarily reflect the earlier or later dates on which the Motorhome was dropped off for repairs or picked up by Rogers. (Doc. 100, PageID.3185-86; Doc. 99, PageID.3014-15). The Court would also add to these 137 days an additional fourteen days in which the Motorhome could have reasonably been considered out of use, beginning on August 14, 2022, when Rogers returned from his last trip after the second leaking event, through August 27, 2022, the day before he was able to return the Motorhome to Great American for repairs. (Doc. 103, PageID.3335). This brings the total days the Motorhome was out of use to at least 151 out of 488, or 31% of the total days between the date of delivery and the date Rogers sent the revocation letter.

Rogers retained Patrick Meyers, a certified RV inspector, as an expert to testify at trial as to the condition of the Motorhome, including as to any signs of water damage. (Doc. 99, PageID.3034, 3043-44). Meyers attended the National RV Training Academy in 2023, which included training on ways to spot water intrusion and water damage in an RV. (Doc. 99, PageID.3034-35; Plaintiff's Exhibit 47). Meyers typically performs inspections for potential RV buyers to give them an unbiased opinion on the condition of any RV they consider for purchase. (Doc. 99, PageID.3035).

Meyers provided an initial assessment of Rogers' Motorhome on April 8, 2024, based on photographs and videos of the Motorhome provided by Rogers. (Doc. 99, PageID.3037; Plaintiff's Exhibit 42). Generally, Meyers noted that "[m]ultiple photos

demonstrate water intrusion and what appears to be water or moisture-related damage in various areas inside the coach." (Plaintiff's Exhibit 42). He further noted "substantial water damage, discoloration and rot inside the ceiling compartment showing where water came through the ceiling." (Plaintiff's Exhibit 42). He testified that the photographs showing the discoloration indicated "potential damage there or hidden damage that may not have been addressed." (Doc. 99, PageID.3037-38).

Meyers then performed an inspection of the Motorhome at Great American's dealership on April 30, 2024, with Rogers present, and he prepared a report documenting his findings and including photographs taken during his inspection. (Doc. 99, PageID.3040; Plaintiff's Exhibit 44[5]). The report documents several areas in the Motorhome that Meyers opined were evidence of water damage, including discoloration on the ceiling and ceiling panels, discoloration on the bathroom ceiling, discoloration and damage on the skylight, several locations on the wall panels showing water staining or delamination, and staining on the closet and bathroom floors. (Plaintiff's Exhibit 44, p. 25-30; Doc. 99, PageID.3045-50). The report also documents loose and sagging ceiling panels, which Meyers would not have expected to see in a two- to three-year-old RV. (Plaintiff's Exhibit 44, p. 23-24; Doc. 99, PageID.3051-53). In conclusion, Meyers testified that his observations at the inspection on April 30, 2024, revealed indications of water intrusion into the Motorhome. (Doc. 99, PageID.3056-57). On cross-examination, Meyers stated that he did not feel any evidence of moisture in the Motorhome, even though the

---

[5] The Trial Transcript's Index of Exhibits (Doc. 99, PageID.3068-69) fails to include Plaintiff's Exhibit 44, Meyers' RV Inspection Report, although it was admitted at trial. (*See* Doc. 99, PageID.3042-43, 3053).

Motorhome had been sitting outside in the elements, and it was raining at the time of the inspection. (Doc. 99, PageID.3062-63).

Defendants retained Steve Hayes, lead scientist and owner of Hayes Microbial Consulting, and offered his testimony at trial as an expert in mold analysis. (Doc. 100, PageID.3212-13). Tiffin had mold testing performed on air samples taken from the Motorhome. (Doc. 100, PageID.3213). One sample was taken in the area of the master bedroom and bathroom, and a second sample was taken in the front of the Motorhome. (Doc. 100, PageID.3213). Another sample was taken outside the Motorhome as a control sample. (Doc. 100, PageID.3213-14). On October 5, 2022, Hayes received and tested the samples and later prepared a report showing the results. (Doc. 100, PageID.3213, 3216; Defendants' Exhibit 9). Hayes explained that his report shows that the low number of spores in the interior of the Motorhome could be accounted for as coming from the air outside and further explained that the low numbers of spores inside indicated a "passing test". (Doc. 100, PageID.3214-15; Defendants' Exhibit 9). Only air samples were tested after all of the wet material was removed from the Motorhome; no samples of materials from the Motorhome were provided for testing. (Doc. 100, PageID.3217, 3278).

Defendants also retained Doug Lown, Vice President of Coachlight Recreational Vehicle Sales, Inc., an RV dealership in Carthage, Missouri, as an expert in RV systems, repair, and appraisal to testify at trial. (Doc. 100, PageID.3219, 3228). Lown has been with Coachlight full-time for approximately 37 years. (Doc. 100, PageID.3219). He is currently involved in sales, including the appraisal and valuation of RVs, and also oversees the service department, including having "final say" over every repair estimate

written at Coachlight. (Doc. 100, PageID.3219-21). He is certified as a technician by the Recreational Vehicle Dealers Association. (Doc. 100, PageID.3223-26).

Lown inspected Rogers' Motorhome in April 2024 at Great American's dealership. (Doc. 100, PageID.3228). Defense counsel provided him with some background information to review before the inspection, including the complaint and repair orders. (Doc. 100, PageID.3229). Generally, Lown went through a number of issues that had been identified by Rogers and found no serious issues remaining at the time of his inspection.

Regarding the leak to the area "where the roof of the slideout meets the front fascia," Lown said he saw no water and no signs of water damage to the fascia. (Doc. 100, PageID.3243). He stated that from the pictures he viewed before his inspection, "the leak was quite minor, in my opinion…more than likely it was just a piece of loose sealant where the seam was where the roof met the back of the fascia would be my guess." (Doc. 100, PageID.3243). He further stated that he did not observe any permanent damage to the ceiling panels in the slide out or trim in that area, and that "from what I had seen, the amount of water, I wouldn't consider that enough water to do any damage." (Doc. 100, PageID.3243-44).  Lown concluded that any issues in this area had been repaired. (Doc. 100, PageID.3244).

Regarding the back bathroom area, Lown stated that the only remaining issue he saw was "some residual staining" where he believes water ran down the wallpaper in the bathroom. (Doc. 100, PageID.3245-46). He felt the walls and used a moisture meter, and he did not observe anything to indicate an unusual amount of moisture at the time of his inspection in April 2024. (Doc. 100, PageID.3245-46). To replace the wallpaper, Lown

estimated as a worst-case scenario, a $3,000 repair cost, and best-case, the walls could simply be cleaned for approximately $450. Lown also did not find it unusual that the ceiling panels noted in Meyers' report as loose or sagging were not "square". (Doc. 100, PageID.3249-51). Lown stated at the time of his inspection, after the Motorhome had been sitting outside on Great American's lot for an extended period of time, he did not see any signs of water or water damage that would indicate water was still leaking into the Motorhome. (Doc. 100, PageID.3252-53).

Lown concluded that in a "worst-case scenario" the cost of the remaining repairs needed would total approximately $4,850, but, in a "much-more-likely" scenario, the repairs would total approximately $2,850 or less. (Doc. 100, PageID.3263-64). To determine the value of the Motorhome with the remaining defects, Lown stated that he would simply deduct the cost of repairs needed from the value of the Motorhome. (Doc. 100, PageID.3267). He also noted that in his experience, if a "unit has been repaired and successfully cured" of any issues during the warranty period, he does not believe those have any effect on the value of the unit, and the repair history would not adversely affect the value of a motorhome. (Doc. 100, PageID.3267).

On cross-examination, however, Lown agreed with the statement that "there could be significant damage in the history of [an] R.V.…that a buyer would want to know but would not be apparent from…whatever cosmetic repairs were made at the time the buyer reviewed it." (Doc. 100, PageID.3275). He then added "[b]ut, most of the time when it gets to that point, then the insurance companies are going to get involved and then the unit would be branded as a salvage unit, and then it's branded for life at that point." (Doc. 100, PageID.3275). He concluded his testimony by noting that, in giving his appraisal of the

Motorhome's value, he did not consider whether a buyer would be informed of the history of the Motorhome and based his opinion only on his observations at the date of his inspection. (Doc. 100, PageID.3275).

## II.    CONCLUSIONS OF LAW

### A. Great American - Revocation of Acceptance

Rogers asserts a claim for revocation of acceptance of the Motorhome against the seller, Great American, pursuant to Alabama Code § 7-2-608, which provides:

> (1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it:
>
> > (a) On the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or
> >
> > (b) Without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.
>
> (2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.
>
> (3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

Ala. Code § 7-2-608 (1975). Whether there is a substantial impairment of value is a question for the trier of fact. *Dickson v. U-J Chevrolet Co.*, 454 So.2d 964, 966 (Ala. 1984). The evaluation also includes a subjective test which requires a determination of substantial impairment *to the buyer*. Ala. Code § 7-2-608, Official Commentary, Note 2; *see also Tiger Motor Co. v. McMurtry*, 224 So. 2d 638, 645 (1969). In Alabama cases involving the attempted revocation of a vehicle or motorhome, factors to consider on whether there has been a substantial impairment of value include the extensiveness of

the repairs, the actual use and ability to use the vehicle, and the success of the repair. *See Dickson*, 454 So.2d at 966*; see also Floyd v. Bankston Motor Homes, Inc.,* No. CV-06-S-542-NE, 2007 WL 9711652, at *4 (N.D. Ala. Sept. 28, 2007).

The relevant time to determine substantial impairment is at the moment of revocation. *See Page v. Dobbs Mobile Bay, Inc.*, 599 So. 2d 38, 43 (Ala. Civ. App. 1992); *Floyd*, 2007 WL 9711652, at *4.  Before a buyer revokes his acceptance of a commercial unit, the seller has the right to seasonably cure the nonconformity if the buyer accepted it on the reasonable assumption that the nonconformity would be cured. *Dickson*, 454 So. 2d at 966. Further, although the law does not "confer an unlimited right to attempt repairs," the opportunity to provide repairs must be reasonable. *Tiger Motor Co.*, 224 So. 2d at 645.

The two Alabama cases most analogous to this situation involved buyers of a new conversion van (*Page*) and a new motorhome (*Floyd*). *See Page v. Dobbs Mobile Bay, Inc.*, 599 So. 2d 38 (Ala. Civ. App. 1992); *see also Floyd v. Bankston Motor Homes, Inc.,* 2007 WL 9711652 (N.D. Ala. Sept. 28, 2007). The court found in each case that the buyers were permitted to revoke their acceptance because, as a result of numerous defects required extensive repairs, the new units did not conform to what the buyers were entitled to believe they would receive. *See Id.* In *Page*, the Alabama Court of Civil Appeals affirmed the trial court's judgment in favor of the buyers on their revocation claim, finding:

> There was clear evidence before the court in the present case that the van's nonconformity with what the Pages were entitled to believe they would receive — i.e., a reasonably reliable and defect-free new van — substantially impaired the value of a commercial unit for which the Pages had made a significant outlay of money. We conclude that the trial court was correct in finding that the Pages had met the requirements of § 7–2–608 in order to revoke their acceptance of the van.

*Page*, 599 So. 2d at 43. In *Floyd*, the Northern District of Alabama granted summary judgment in favor of the buyers on their revocation claim, finding:

> The plaintiffs in this case were[,] similarly [to *Page*,] entitled to believe they would receive a reliable and defect-free Coach. Instead, they received a Coach with a substantially impaired value *to them* and, as such, they are allowed to revoke acceptance of that Coach.

*Floyd,* at *5 (emphasis in original). *Page* and *Floyd* support a finding that the Motorhome Rogers received from Great American did not conform to what Rogers was entitled to believe he would receive; in other words, as the purchaser of a *new* almost $400,000 motorhome, Rogers was entitled to believe he had bargained for a reasonably reliable and defect-free motorhome. The evidence presented in this case demonstrates this was not what Rogers received. *See Page*, 599 So. 2d at 43; *Floyd*, at *5.

In considering the factors bearing on whether there has been a substantial impairment of value — the extensiveness of the repairs, the actual use and ability to use the vehicle, and the success of the repair — the evidence supports a finding in favor of Rogers as to each of these factors. *See Dickson*, 454 So.2d at 966*; see also Floyd*, at *4. First, there is no doubt that an extensive number of repairs were required, including, but not limited to, the awnings, the slide outs, the tank sensors, the leveling systems, the control panel, the safety recalls, and most notably those required as a result of the water leaks.

Second, Rogers demonstrated that issues with the Motorhome's systems began on his very first trip and continued until his last trip. As a result, the Motorhome was out of use for a considerable number of days due to the issues experienced by Rogers and the time needed for repairs. As the Court noted above, the Motorhome was out of use at least 151 out of 488 days, or 31% of the total days between the date of delivery and the

date Rogers sent the revocation letter.[6] While Rogers did get to take some trips in the Motorhome, he had to spend time on many of his trips dealing with issues with the unit, and he had to cancel or cut short other trips. He was unable to use the Motorhome to spend time in retirement traveling with his family as intended, and his wife now refuses to use the Motorhome due to the problems they experienced and seeing what she believed to be mold in the unit.

Third, the success of the repairs weighs in Rogers' favor because it does not appear, due to the extensiveness of the water damage from the leaks,[7] that the Motorhome can ever be repaired such that it will be free from defect or that it can be restored to the product for which Rogers had bargained. While the evidence suggests that the leaks themselves have been repaired so that no water is currently intruding into the Motorhome, the Defendants' own RV expert conceded that buyers of a home, boat, or RV that has experienced significant damage would want to be informed of that damage, even if it had been repaired and was not apparent, and that the property becomes a "salvage" unit and is "branded for life at that point." (Doc. 100, PageID.3275). Along these lines, Rogers testified that "the tipping point" for him was his call with the Tiffin technician, in which he was told the extent and nature of the damage and the repairs that were being made to his Motorhome. (Doc. 99, PageID.2925). After speaking with the technician,

---

[6] The Court is not persuaded by Defendants' argument that only the days the Motorhome was in for repairs *and* during which Rogers had to cancel a planned trip should count as days the Motorhome was out of use. (*See* Doc. 108, PageID.34223).

[7] The Court did not find the Defendants' expert, Lown, to be convincing in his statements minimizing the amount of water that intruded into the Motorhome and the severity of the damage that was sustained. Specifically, after viewing the photographs and videos and hearing the testimony of Rogers and his wife, the Court disagrees with any conclusion that "the leak was quite minor" or that it was not "enough water to do any damage". (*See* Doc. 100, PageID.3243-44).

Rogers stated that he did not believe his Motorhome could have substantially the same value that he expected when he paid for a new motorhome, and he had not bargained for a used or refurbished motorhome. (Doc. 99, PageID.2926-27). Additionally, Rogers' expert testified that signs of water intrusion remained at the time of his inspection.

Finally, the Court disagrees with Great American's argument that because its Buyer's Order disclaimed any express or implied warranties there can be no non-conformity to support a revocation claim. (*See* Doc. 104, PageID.3344-45; Plaintiff's Exhibit 1, p. 4). In *Page*, the dealer had also disclaimed its own warranties and, similarly to Great American, argued there could be no revocation under § 7-2-608 where there was no evidence that the dealer had committed fraud or breach of warranty. The court rejected this argument, holding:

> § 7–2–608 should properly be viewed as affording a remedy in situations where a seller has successfully disclaimed its own warranties. To hold otherwise would be to place the risk of loss on the buyer and to find little meaningful obligation on the part of the seller, who receives substantial benefits from the sale of its goods.

*Page*, 599 So. 2d at 42. The courts' failure in *Page* and *Floyd* to discuss the applicable sales contracts, other than to cite to a general disclaimer of warranties, does not make those cases distinguishable from the instant case, in which the Motorhome was sold "AS IS". (*See* Doc. 104, PageID.3344-45; Plaintiff's Exhibit 1, p. 4). These cases all involve the sale of a *new* vehicle or motorhome, and Alabama caselaw follows the commonsense conclusion that the buyer of a *new* unit is entitled to assume, even with a disclaimer of warranties, that he is receiving a reasonably reliable and defect-free product. A seller's failure to deliver such a product can constitute a non-conformity upon which a revocation claim may be brought.

In sum, the evidence established that the Motorhome had numerous latent defects present from the time it was manufactured, which rendered it non-conforming to the new, reasonably reliable and defect-free unit that Rogers was entitled to believe he would receive. As a result of the defects, and despite the fact that many of them were repaired by the time Rogers revoked his acceptance, the value of the Motorhome remained substantially impaired to Rogers at the time of his revocation. Therefore, Rogers effectively revoked his acceptance of the Motorhome upon sending his letter to Defendants on November 1, 2022.

### B. Tiffin - Breach of Express Warranty

The elements of a breach of warranty claim include:

(1) the existence of an express warranty,[8]

(2) that the goods failed to conform to the warranty,

(3) that the plaintiff timely notified the warrantor of the failure to conform, and

(4) that the plaintiff was damaged by the breach.

*See Wait v. Roundtree Mobile, LLC*, 2015 WL 6964668, at *3 (S.D. Ala. Nov. 10, 2015) (existence of a warranty); *Ex parte Miller*, 693 So. 2d 1372, 1376 (Ala. 1997) (failure to conform); *Hart v. Yamaha-Parts Distributors, Inc.*, 787 F.2d 1468, 1474 (11th Cir. 1986) (notice). The proof required for damages for breach of warranty under Alabama law is established in Alabama's version of the Uniform Commercial Code, which states:

> The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

---

[8] The parties agree that an express warranty exists in Tiffin's Limited Warranty and that the Warranty applies to the Motorhome. (Doc. 86, PageID.1960-61).

Ala Code. § 7-2-714(2) (1975). When "special circumstances" have been held to apply, they simply change the "time and place" to a time other than the time of acceptance, such as the time and place the defect was discovered. *See Harlan v. Smith*, 507 So. 2d 943, 945 (Ala. Civ. App. 1986) (holding that special circumstances made the proper measure of damages the value of the accepted goods at the time the defect was discovered).

"Alabama law is clear that where a warranty fails of its essential purpose, a buyer is not constrained by its limitation of remedy provisions." *McCollough Enters., LLC v. Marvin Windows & Doors*, No. CIV.A. 09-0573-WS-B, 2010 WL 5014670, at *8 (S.D. Ala. Dec. 2, 2010); *see* Ala. Code § 7–2–719(2) ("Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title."). To prove that a warranty has failed of its essential purpose, a plaintiff must show that the warrantor (1) "refused to repair or replace the [product] in accordance with the warranty" or (2) "did not repair the [product] within a reasonable time." *Ex parte Miller*, 693 So. 2d 1372, 1379 (Ala. 1997) (citing *Ag–Chem Equipment Co. v. Limestone Farmers Co-op., Inc*., 567 So.2d 250, 252 (Ala.1990)). A reasonable time means that "at some point in time, it must become obvious to all people that a particular [product] cannot be repaired or parts replaced so that the same is made free from defect." *Ex parte Miller*, 693 So. 2d at 1378. For a warranty to fail of its essential purpose it must be "so hollow or ineffectual as to be meaningless." *Ex parte Miller,* 693 So. 2d at 1379.

In *Forest River v. Posten*, the Alabama Court of Civil Appeals upheld an award of damages to the buyers of a defective RV on their breach of warranty claim, holding:

> Here, evidence was presented that the cost of repairs with parts of like kind and quality would not restore the RV to its fair market value free from defects. Therefore, the trial court could logically conclude that the limited warranty had failed of its essential purpose so as to warrant an award of

damages as allowed by the Uniform Commercial Code, Title 7, Code of Alabama 1975.

*Forest River, Inc. v. Posten*, 847 So. 2d 957, 960 (Ala. Civ. App. 2002). Similarly, the Court finds that the extensive water damage and repairs to the Motorhome prevent it from being restored to its fair market value free from defects. As a result, the repair and replace Warranty has failed of its essential purpose and Rogers is not constrained by its limitation of remedy provisions.

Rogers established that there was a leak around the passenger side wall slide in June 2022. He then took the Motorhome to Great American for repairs, where it remined for 24 days, at which time Great American claimed to have fixed the leak and returned the Motorhome to Rogers. But the Motorhome began leaking again in the same spot on Rogers' very next trip in August 2022. At that time, Rogers and his wife also noticed significant water damage and what appeared to be mold in the back of the Motorhome. The evidence demonstrated that the water in the rear of the Motorhome was likely caused by holes in the AC drain line, which would have been present from the time the Motorhome was manufactured. Rogers immediately contacted Great American and brought the Motorhome back for repairs. It is undisputed that Rogers never picked the Motorhome up from Great American after bringing it back in August 2022, and instead he sent a letter revoking his acceptance on November 1, 2022.

As noted above regarding the revocation claim, Rogers testified that "the tipping point" for him was his call with the Tiffin technician, in which he was told the extent and nature of the damage and the repairs that were being made to his Motorhome. (Doc. 99, PageID.2925). After speaking with the technician, Rogers stated that he did not believe his Motorhome could have substantially the same value that he expected when he paid

for a new motorhome, and he had not bargained for a used or refurbished motorhome. (Doc. 99, PageID.2926-27). Rogers further testified that if he were to sell the Motorhome now, he would feel compelled to disclose his experiences with it, and, in his opinion, he would only receive around $100,000 for it. (Doc. 99, PageID.2938-39). If the Motorhome had not been defective, Rogers believed the Motorhome would have depreciated about fifteen percent from the price he paid. (Doc. 99, PageID.2940).[9] Again, the Defendants' own RV expert, Lown, conceded that buyers of a home, boat, or RV that has experienced significant damage would want to be informed of that damage, even if it had been repaired and was not apparent, and that the property becomes a "salvage" unit and is "branded for life at that point." (Doc. 100, PageID.3275). Lown also stated that, in giving his appraisal of the Motorhome's value, he did not consider whether a buyer would be informed of the history of the Motorhome and based his opinion only on his observations at the date of his inspection. (Doc. 100, PageID.3275). Finally, Rogers' expert testified that signs of water intrusion remained at the time of his inspection.

Thus, as with the revocation claim, even though many repairs have been made and there is no evidence water is currently intruding into the Motorhome, it does not appear, due to the extensiveness of the water damage and the history of repairs, that the Motorhome can ever be repaired such that it will be free from defect or that it can be restored to the fair market value for which Rogers had bargained. As a result, the Court finds that Tiffin's Limited Warranty has failed of its essential purpose.

### C. Tiffin - Violation of the Magnuson-Moss Warranty Act

---

[9] It is well settled in Alabama that an owner of property is competent to give opinion testimony as to its value. *Empiregas, Inc. of Huntsville v. Simpson*, 549 So. 2d 27, 29 (Ala. 1989) (recognizing the general rule that a party may testify to the market value of his own property).

The Magnuson-Moss Warranty Act, 15 U.S.C. § 2310(d)(1) ("MMWA"), allows claims by a consumer against any "supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty. . .." 15 U.S.C. § 2301 *et seq*. A central effect of the MMWA is to allow consumers to sue a warrantor directly, without respect to contractual privity. *Abraham v. Volkswagen of Am., Inc.*, 795 F.2d 238, 248 (2d Cir. 1986). Accordingly, the MMWA provides a cause of action for a consumer to sue for breach of an express warranty. *See* 15 U.S.C. § 2310(d)(1). Liability under the MMWA hinges entirely on a defendant's liability for breach of warranty under existing state law. *See, e.g., Kelly v. Lee Cty. RV Sales Co*., 819 Fed. App'x. 713, 717 (11th Cir. 2020) (ruling that Florida state law governs whether the RV manufacturer breached its express warranty).

The parties have stipulated that Tiffin's Warranty is a written warranty under the MMWA. (Doc. 85, PageID.1962). Necessarily then, Rogers is a "consumer," which is defined as "a buyer . . . of any consumer product. . . who is entitled by the terms of such warranty (or service contract) or under applicable State law to enforce against the warrantor." 15 U.S.C. § 2301(3). There is likewise no dispute that the Motorhome is a "consumer product," which is defined as a product "normally used for personal, family, or household purposes." 15 U.S.C. § 2301(1). Finally, the parties agree that Tiffin's liability under the MMWA is governed by the same law and facts addressed in the breach of express warranty claim against Tiffin. (Doc. 85, PageID.1962). Because the Court has found Tiffin liable for breach of its express warranty, it also finds corresponding liability as to Tiffin under the MMWA.

### D. Damages

27

### 1. Revocation

In *Page*, the court explained the proper measure of damages for a revocation claim:

> [Alabama Code] Section 7-2-711 provides that a buyer who revokes acceptance of nonconforming goods may recover, in addition to any consideration paid on the contract, certain damages. Such damages do not include the difference-in-value amount available under § 7-2-714(2) [for breach of warranty], but instead comprise incidental and consequential damages [as provided under § 7-2-715]. Incidental damages include expenses reasonably incurred in inspection, receipt, transportation, care, and custody of goods rightfully rejected. § 7-2-715(1). Consequential damages include any loss resulting from general or particular requirements and needs of which the seller, at the time of contracting, had reason to know and which could not reasonably be prevented by cover or otherwise. § 7-2-715(2). For instance, a buyer may recover for loss of use if the seller had knowledge of the buyer's intended use of the goods.

*Page*, 599 So. 2d 38, 44 (Ala. Civ. App. 1992) (internal citations omitted). Specifically, § 7-2-711(1) states that the buyer who revokes acceptance may recover certain damages "in addition to recovering so much of the price *as has been paid*." Ala. Code § 7-2-711(1) (1975) (emphasis added). This section does not provide, as requested by Rogers, that the buyer may recover the *full* purchase price, where, as here, that price has not been paid in full.

Relying on *Floyd*, Rogers asserts that he should be awarded the Motorhome's full purchase price of $393,447.47. (Doc. 105, PageID.3373-74). However, *Floyd* was decided on summary judgment, and, in awarding the full amount of damages claimed by the buyer, the court stated that "[d]efendant has not challenged any element of [plaintiff's] claim for damage in its summary judgment submission." *Floyd*, 2007 WL 9711652, at *5. The undersigned disagrees that Rogers is entitled to recover the full purchase price,

which would include amounts he has not yet paid. Under § 7-2-711(1), Rogers is only entitled to recover amounts he has actually paid.

Rogers established that he paid a $60,000 down payment. Rogers financed the remaining balance and testified that, at the time of trial in November 2024, he continued to make monthly payments of $2,198.76. At the time of trial, Rogers had made 40 monthly payments totaling $87,950.40. Therefore, in addition to the $60,000 down payment, Rogers is entitled to recover $87,950.40 for the monthly payments he has made, for a total of $147,950.48 in damages.[10] As noted above, the purchase price of $393,447.47 includes $10,889.97 in sales tax, $515.50 in title and documentation fees, and $19,542 in additional warranties and protections, and the monthly payments include interest under the financing agreement established at the time of sale. To the extent the $147,950.48 in damages includes payment for any of these amounts, those are included as incidental and consequential damages related to the purchase of the Motorhome.

The Court also finds that the $4,825.27 Rogers paid separately for the necessary towing equipment and its installation by Great American is recoverable as an incidental expense. Rogers is also entitled to recover as consequential damages the $450 he paid for his reserved RV parking spot for football games in 2022, which he was unable to use because the Motorhome was out of use. (Plaintiff's Exhibit 37; Doc. 99, PageID.2947-48, 2989). The Court does not award damages for 2022 hotel expenses incurred to attend football games when the Motorhome was out of use, as there was no testimony or

---

[10] If Rogers has made additional monthly payments since the time of trial through the date of this Order, he may submit evidence of those to the Court in a post-judgment motion, which must be submitted **within 14 days of this Order**.

documents provided to substantiate those damages.[11] The Court does not award damages for any annual registration/tag fees, county taxes, or insurance coverage for 2021 and 2022, as Rogers obtained the benefit of those payments through his use of the Motorhome during that time. The Court does award consequential damages of $2,211.65 for insurance coverage in 2023, because, while this amount was paid after Rogers' revocation, he was still making payments on the Motorhome and was undoubtedly required by his lender to have insurance coverage for the Motorhome. (Plaintiff's Exhibit 38; Doc. 99, PageID.2946-47). The Court does not award damages for storage fees for 2021 or 2022, as Rogers obtained the benefit of those payments during that time. As for storage expenses claimed for 2023, there was no testimony or documents presented to establish why Rogers would have continued to incur storage fees in 2023, after he revoked his acceptance and refused to pick the Motorhome up from Great American. Accordingly, Rogers is awarded $7,486.92 in incidental and consequential damages (for the towing equipment and installation, 2022 RV parking spot, and 2023 insurance) in addition to the $147,950.48 in payments he has made on the Motorhome, for a total of $155,437.40.

Finally, Alabama courts have long recognized that the right to recover incidental and consequential damages under the UCC can include damages for mental anguish and emotional distress. *Horton Homes, Inc. v. Brooks*, 832 So. 2d 44, 53 (Ala. 2001) (incidental damages, including damages for mental anguish recoverable in warranty claim involving a mobile home); *Volkswagen of Am., Inc. v. Dillard*, 579 So. 2d 1301, 1304 (Ala. 1991) (mental anguish damages recoverable in breach of warranty arising from purchase

---

[11] The only hotel receipt provided was actually for a stay in 2023 after Rogers revoked his acceptance. (Plaintiff's Exhibit 38, p. 1; Doc. 99, PageID.2988).

of new automobile); *Forest River, Inc. v. Posten*, 847 So. 2d 957, 961 (Ala. Civ. App. 2002) (incidental damages award upheld in breach of warranty case involving defective motorhome). These cases apply the basic rule regarding recovery of mental anguish damages for breach of contract articulated by the Supreme Court of Alabama:

> In Alabama the general rule is that mental anguish is not a recoverable element of damages arising from breach of contract. This court, however, has traditionally recognized exceptions to this rule in certain cases. The exceptions are stated in the following excerpt…"Yet where the contractual duty or obligation is so coupled with matters of mental concern or solicitude, or with the feelings of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering, it is just that damages therefor be taken into consideration and awarded."

*B & M Homes, Inc. v. Hogan*, 376 So. 2d 667, 671 (Ala. 1979) (internal citations and quotations omitted).

In Alabama, mental anguish includes anxiety, embarrassment, anger, fear, frustration, disappointment, worry, annoyance, and inconvenience. *Dillard*, 579 So.2d at 1307 (Ala.1991); *Hogan,* 376 So.2d at 673 (Ala.1979). Whether the evidence justifies an award for emotional distress and the amount of that award is, under Alabama law, completely up to the fact-finder. *See Dillard*, 579 So.2d at 1304 (Ala.1991) ("[T]he question of damages for mental anguish becomes a question of fact for the jury to decide."); *Hogan*, 376 So.2d at 673; *see also* Alabama Pattern Jury Instruction 11.38 ("There is no legal rule or yardstick that tells you how much money to award for (mental anguish/emotional distress). The amount you decide to award is up to you, but it must be fair and reasonable, based on sound judgment, and proved by the evidence. In deciding the amount of the award, you may consider, among other things, the nature, severity, and length of the time (name of plaintiff) had (mental anguish/emotional distress)").

Based on the testimony presented that Rogers purchased the Motorhome with the intent of using it in retirement to travel with his family, coupled with the anxiety, frustration, disappointment, worry, annoyance, and inconvenience resulting from the numerous issues surrounding the Motorhome culminating with the repeated instances of water intrusion, the Court finds Rogers is entitled to recover damages for mental anguish. The Court awards $50,000 in damages for mental anguish. This amount is just over 31% of the total revocation damages listed above and is based on the previously calculated percentage of days the Motorhome was out of use between the date of delivery and the date Rogers sent his revocation letter.

In sum, Rogers is awarded damages of $205,437.40 for his revocation of acceptance claim. In exchange, all title and rights to the Motorhome are held by Great American, who is already in possession of the Motorhome.

### 2. Breach of Warranty

As noted above, the damages for breach of warranty are "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." Ala Code. § 7-2-714(2) (1975). Rogers has established a breach of warranty claim and that Tiffin's Warranty failed of its essential purpose. Therefore, Rogers is not constrained by the Warranty's limitation of remedy provisions and may recover the difference in value and any incidental or consequential damages. *See McCollough Enters.,* WL 5014670, at *8; *see also* Ala. Code § 7–2–719(2) and § 7-2-715. However, Rogers has acknowledged that he is not seeking a double recovery under both his revocation claim and his breach of warranty claim and is only

requesting diminution in value damages if the Court does not award revocation damages. (Doc. 105, PageID.3389-90). Further, Rogers' actions in refusing to pick up the Motorhome from Great American signal to the Court that he has elected to return the Motorhome and seek damages for revocation rather than for loss in value under a breach of warranty claim. Accordingly, the Court will not perform a damages calculation for the loss in value to the Motorhome. Finally, the failure of the Warranty's essential purpose also entitles Rogers to incidental and consequential damages, which are not included here as they would be duplicative of those included as part of the revocation damages.

### 3. Magnuson-Moss Warranty Act

As a result of prevailing on his breach of warranty claim, Rogers is entitled to recover damages from Tiffin under the MMWA, which coincide with those available under Alabama law for breach of warranty. While the Court has not awarded damages specifically for breach of warranty, the MMWA also allows the Court to award attorney's fees and costs for violation of the MMWA. 15 U.S.C. § 2310(d)(2). The Court will determine the appropriate amount of attorney's fees and any additional costs to be awarded to Rogers upon the submission of a motion consistent with Fed. R. Civ. P. 54(d).

### III. CONCLUSION

For the reasons set forth above, the Court **ORDERS** Defendant Great American to pay Rogers, as damages for revocation of acceptance, $205,437.40.[12] The Court **ORDERS** Defendant Tiffin to pay Rogers, for violation of the MMWA, attorney's fees and costs in an amount to be determined upon submission of Rogers' motion. Judgment will be entered separately.

---

[12] This amount is subject to adjustment for monthly payments made after trial, if established in a post-judgment motion from Rogers.

**DONE** and **ORDERED** this the 10th day of June, 2025.

s/P. BRADLEY MURRAY
**UNITED STATES MAGISTRATE JUDGE**